Slip Op. 18-15

## UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| **SILFAB SOLAR, INC., et al.,** |
| Plaintiffs, |
| v. |
| **UNITED STATES, et al.,** |
| Defendants, |
| and |
| **SOLARWORLD AMERICAS, INC., et al.,** |
| Defendant-Intervenors. |

**Before: Timothy C. Stanceu, Chief Judge**

**Court No. 18-00023**

## <u>OPINION AND ORDER</u>

[Denying plaintiffs' motion for a temporary restraining order and a preliminary injunction]

Dated:  March 5, 2018

*Jonathan T. Stoel* and *Mitchell P. Reich*, Hogan Lovells US, LLP, of Washington, D.C., argued for plaintiffs.  With them on the brief were *Craig A. Lewis*, *Michael G. Jacobson*, and *Robert B. Wolinsky*.

*Stephen C. Tosini*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington D.C., argued for defendant United States.  With him on the brief were *Chad A. Readler*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, *Tara K. Hogan*, Assistant Director, and *Joshua E. Kurland*, Trial Attorney.

*John D. Henderson*, Attorney-Advisor, Office of the General Counsel, U.S. International Trade Commission, of Washington, D.C., argued for defendant U.S. International Trade Commission.  With him on the brief was *Andrea C. Casson*, Assistant General Counsel for Litigation.

*Timothy C. Brightbill*, Wiley Rein LLP, of Washington, D.C., for defendant-intervenor SolarWorld Americas, Inc.  With him on the brief were *Laura El-Sabaawi* and *Usha Neelakantan*.

*Matthew J. McConkey*, Mayer Brown LLP, of Washington, D.C., for defendant-intervenor Suniva Inc.

Stanceu, Chief Judge: Plaintiffs Silfab Solar, Inc., Heliene, Inc., Canadian Solar (USA), Inc., and Canadian Solar Solutions, Inc. move for a temporary restraining order and preliminary injunction to prohibit defendants from subjecting plaintiffs' products to "safeguard" measures, in the form of temporary import duties, that the United States recently imposed on imports of certain crystalline silicon photovoltaic ("CSPV") cells and certain products (including "modules") that contain such cells.

Because plaintiffs have failed to demonstrate a likelihood that they will succeed on the merits of their claims, and because they have not demonstrated that the imposition of the equitable relief they seek would be in the public interest, the court denies their motion.

## I. BACKGROUND

### A. The Parties to this Litigation

Plaintiffs Silfab Solar, Inc., Heliene, Inc., and Canadian Solar Solutions, Inc. are Canadian producers and exporters of CSPV modules, which are products that incorporate CSPV cells and that are intended for use in the residential, commercial, and industrial generation of solar electricity.  Compl. ¶¶ 8, 9, 11 (Feb. 7, 2018), ECF Nos. 2 (public), 16 (conf.).  Plaintiff Canadian Solar (USA), Inc. is a U.S. importer of solar cells and modules, including products from Canadian Solar Solutions, Inc.  *Id*. ¶ 10.

Plaintiffs have named as defendants in this action the United States, U.S. Customs and Border Protection ("CBP") and its acting Commissioner, the U.S. International Trade Commission (the "Commission" or the "ITC") and its Chairman, and the Office of the United States Trade Representative and the U.S. Trade Representative (collectively, the "USTR").  *Id*.

¶¶ 12-18.  Defendant-intervenors Suniva Inc. ("Suniva") and SolarWorld Americas, Inc.

("SolarWorld") are U.S. manufacturers of CSPV cells and modules.

### B. The President's Proclamation

President Trump issued Proclamation 9693 of January 23, 2018, "To Facilitate Positive

Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells

(Whether or Not Partially or Fully Assembled Into Other Products) and for Other Purposes" (the

"Proclamation"), which went into effect on February 7, 2018.  Proclamation No. 9693, 83 Fed.

Reg. 3541 (Jan. 25, 2018) (the "*Proclamation*").  The Proclamation, issued under section 203 of

the Trade Act of 1974 (the "Trade Act"), 19 U.S.C. § 2253,[1] imposed (with certain exceptions

not applicable here) temporary "safeguard" duties on import entries of "CSPV cells (whether or

not partially or fully assembled into other products)," to which the Proclamation refers as "CSPV

products."  *Id*.

The temporary duties are to remain in effect for a four-year period beginning on the

effective date (i.e., February 7, 2018).  *Id*. at 3549.  The duties are imposed in the *ad valorem*

rates of 30%, if entered from February 7, 2018 through February 6, 2019, 25%, if entered from

February 7, 2019 through February 6, 2020, 20%, if entered from February 7, 2020 through

February 6, 2021, and 15%, if entered from February 7, 2021 through February 6, 2022.  *Id*.

Under a "tariff-rate quota," the Proclamation exempts from the safeguard duties an annual

aggregate quantity of 2.5 gigawatts of CSPV cells, but not cells assembled into modules or other

products.  *Id*.

---

[1] All citations to the United States Code herein are to the 2012 edition except where
otherwise indicated.

C. Administrative Actions Preceding the Issuance of the Proclamation

Effective May 17, 2017, the Commission initiated an investigation, Investigation

No. TA-201-75, in response to a petition filed by Suniva pursuant to which an entity representing

a U.S. industry may request a "safeguard" action under sections 201 to 203 of the Trade Act "for

the purpose of facilitating positive adjustment to import competition." 19 U.S.C § 2252(a)(1).

*Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other*

*Products); Institution and Scheduling of Safeguard Investigation and Determination That the*

*Investigation Is Extraordinarily Complicated*, 82 Fed. Reg. 25,331 (June 1, 2017). The petition

was later joined by SolarWorld.

On November 17, 2017, the Commission transmitted to the President its report on the

investigation, in which it reached an affirmative determination under section 202(b) of the Trade

Act, 19 U.S.C. § 2252(b), that CSPV products "are being imported into the United States in such

increased quantities as to be a substantial cause of serious injury to the domestic industry

producing an article like or directly competitive with the imported article." *Crystalline Silicon*

*Photovoltaic Cells (Whether or not Partially or Fully Assembled into Other Products)*, USITC

Pub. No. 4739, Inv. No. TA-201-75 at 1 (Nov. 2017), *available at*

https://www.usitc.gov/publications/safeguards/pub4739-vol_i.pdf (last visited Mar. 5, 2018)

("*Views of the Commission*"). On November 27, 2017, the USTR requested additional

information from the Commission under section 203(a)(5) of the Trade Act, 19 U.S.C.

§ 2253(a)(5). The ITC responded in a "supplemental report" on December 27, 2017, "that

identified unforeseen developments that led to the importation of CSPV products into the United

States in such increased quantities as to be a substantial cause of serious injury." *Proclamation*

¶ 4.

D. Commencement of this Action and the Filing of the Motion

Plaintiffs filed their complaint in redacted form on February 7, 2018 and, on the same

day, filed their redacted motion for a temporary restraining order and preliminary injunction.

Compl.; Pls.' Mot. for TRO and Prelim. Inj. (Feb. 7, 2018), ECF No. 10.  On February 9, 2018,

following the court entering a protective order, plaintiffs filed unredacted versions of the

complaint and their motion, which contained business-related information for which they claim

confidential treatment.  Pls.' Mot. for TRO and Prelim. Inj. (Feb. 9, 2018), ECF No. 17 (conf.).

Plaintiffs seek a declaratory judgment that the Proclamation as applied to them is contrary to law

and an order enjoining the United States from taking any action to impose or enforce the

Proclamation on products from Canada covered by the Proclamation and from collecting any

tariffs from plaintiffs pursuant to it.  Proposed Prelim. Inj. Order (Feb. 7, 2018), ECF No. 10-16

("Proposed Order").

The court held a telephone conference with the parties on February 12, 2018.  With the

agreement of the parties, the court scheduled an oral argument for February 26, 2018 on the

issues of whether plaintiffs have shown a likelihood of success on the merits and whether a

temporary restraining order or preliminary injunction would be in the public interest.  Order

(Feb. 12, 2018), ECF No. 22.  The court held oral argument on February 26, 2018.

**II. DISCUSSION**

A. Subject Matter Jurisdiction

This action arises out of sections 201-203 of the Trade Act, which provide for the

imposition by the President of safeguard measures, including temporary import duties, to

facilitate the adjustment of a domestic industry to import competition.  Sections 201-203 provide

for tariffs and duties for a reason other than the raising of revenue, i.e., to facilitate that

adjustment.  The court, therefore, exercises jurisdiction according to section 201 of the Customs

Courts Act of 1980, 28 U.S.C. § 1581(i)(2), under which the Court of International Trade is

empowered to review a "civil action commenced against the United States . . . or its officers . . .

that arises out of any law of the United States providing for . . . tariffs, duties, fees, or other taxes

on the importation of merchandise for reasons other than the raising of revenue."

B. Factors to Be Considered for a Temporary Restraining Order and Preliminary Injunction

A party may obtain a temporary restraining order or preliminary injunction if it

demonstrates that it will incur irreparable harm in the absence of such order or injunction, that it

is likely to succeed on the merits of the action, that the balance of hardships favors the

imposition of temporary equitable relief, and that the temporary restraining order or injunction is

in the public interest.  *Wind Tower Trade Coal. v. United States*, 741 F.3d 89, 95 (Fed. Cir. 2014)

(factors for considering motion for preliminary injunction); *Qingdao Taifa Group Co. v. United

States*, 581 F.3d 1375, 1378 (Fed. Cir. 2009) (same); *see* 13 James Wm. Moore, et al., Moore's

Federal Practice § 65.36 (3d ed. 2015) (factors for considering application for temporary

restraining order).  In analyzing a request for injunctive relief under these factors, "[n]o one

factor, taken individually, is necessarily dispositive, because the weakness of the showing

regarding one factor may be overborne by the strength of the others."  *Belgium v. United States*,

452 F.3d 1289, 1292-93 (Fed. Cir. 2006) (internal quotation marks and citations omitted).

Rather, the Court of Appeals for the Federal Circuit (the "Court of Appeals") has identified a

"sliding scale" under which, for example, a greater showing of potential irreparable harm results

in a lesser burden on plaintiffs to show a likelihood of success on the merits.  *Id.* at 1293 (citing,

*inter alia*, *Corus Group PLC v. Bush*, 26 CIT 937, 942, 217 F. Supp. 2d 1347, 1353-54 (2002)).

However, even if a party can show that it will be irreparably harmed, "the party must . . .

demonstrate that it has at least a fair chance of success on the merits for a preliminary injunction

to be appropriate." *Wind Tower Trade Coal.*, 741 F.3d at 96 (citing *Qingdao Taifa*, 581 F.3d

at 1381) (internal quotation marks and citation omitted).

For the reasons discussed in this Opinion and Order, the court concludes that plaintiffs

have not demonstrated that they have a fair chance to succeed on the merits of any of their three

claims.  The court further concludes that they have failed to show that the equitable relief they

seek would be in the public interest.  Therefore, even were the court to presume, without

deciding, that plaintiffs would be able to demonstrate that they will incur irreparable harm absent

the relief they seek, and that the balance of hardships is in their favor, they still would not qualify

for this relief.  In this case, there are no facts in dispute as to the merits of their claims, and the

court is able to assess their likelihood of success by considering pure questions of law stemming

from the interpretation of the applicable statutes.  While arguing that their showing of likelihood

of success on the merits should be viewed on a sliding scale based on a strong showing of

irreparable harm, they have failed to show that the statutory interpretations on which they have

based their claims are plausible.

### C. Plaintiffs' Claims in this Litigation

Plaintiffs assert three claims in their complaint.  The claims have in common a contention

that the President acted without congressional authority in issuing the Proclamation.  The first

claim identifies a flaw in the proceedings leading up to the issuance of the Proclamation, and the

other two pertain to an aspect of the President's determination itself.  Plaintiffs maintain that the

court must declare the Proclamation unlawful, and prohibit the implementation of the

Proclamation, in response to each of these claims.

First, plaintiffs claim, in Count 1 of their complaint, that the President and the U.S. Trade Representative violated sections 201 and 203 of the Trade Act by adopting a safeguard measure upon a report of the ITC that did not comply with subsection (e) of section 202 of the Trade Act. Compl. ¶ 54.  Section 202(e)(1) directs that the Commission, if making an affirmative determination that imports were a substantial cause of serious injury to a domestic industry, as it did in the proceeding resulting in the issuance of the Proclamation, "shall also recommend the action that would address the serious injury, or threat thereof, to the domestic industry and be most effective in facilitating the efforts of the domestic industry to make a positive adjustment to import competition."  19 U.S.C. § 2252(e)(1).  Plaintiffs point out that the ITC's report did not provide, on behalf of the Commission as a whole, a recommended action to address the serious injury to the domestic industry.  *See Proclamation* ¶ 5 ("The ITC did not recommend an action within the meaning of section 202(e) of the Trade Act (19 U.S.C. 2252(e)).").

Second, plaintiffs claim (in Count 2) that the Proclamation, by including the tariff-rate quota on CSPV cells not assembled into modules or other products, violated section 312(d) of the North American Free Trade Agreement Implementation Act (the "NAFTA Implementation Act"), North American Free Trade Agreement Implementation Act, Pub. L. No. 103-182, 107 Stat. 2057 (1993) (codified at 19 U.S.C. §§ 3301-3473), under which a global safeguard action taken under the Trade Act affecting imports of an article of Canada or Mexico "proclaiming a quantitative restriction shall permit the importation of a quantity or value of the article which is not less than the quantity or value of such article imported into the United States during the most recent period that is representative of imports of such article, with allowance for reasonable growth."  19 U.S.C. § 3372(d).  Maintaining that the tariff-rate quota is a "quantitative restriction" within the meaning of § 3372(d), Compl. ¶ 57, plaintiffs claim that the

adoption and implementation of the Proclamation is contrary to the NAFTA Implementation Act, *id.* ¶ 60.

Third, in Count 3 of their complaint, citing section 311(a) of the NAFTA Implementation Act, 19 U.S.C. § 3371(a), and section 312(a) and (b) of the NAFTA Implementation Act, 19 U.S.C. § 3372(a)-(b), plaintiffs claim that the President lacked authority to impose a restriction on CSPV products from Canada because the ITC found that imports from Canada did not account for a substantial share of total imports and did not contribute importantly to the serious injury, or threat thereof, caused by imports.  Compl. ¶¶ 62-67.  In support of this claim, they submit that section 203(a) of the Trade Act, 19 U.S.C. § 2253(a), provides that the President may impose a safeguard measure only after receiving from the Commission an affirmative finding of serious injury.  *Id.* ¶ 62.

D. Plaintiffs Have Not Shown a Likelihood of Success on the Merits for their Claims

1. Plaintiffs Have Not Shown a Likelihood of Success for the Claim Asserted in Count 1

In the report of its investigation, the four Commissioners of the ITC were unanimous in finding that CSPV products were being imported into the United States in such increased quantities as to be a substantial cause of serious injury to the domestic industry.  *Views of the Commission* at 5 n.2 ("The Commission's affirmative serious injury determination is unanimous, reflecting the views of Chairman Rhonda K. Schmidtlein, Vice Chairman David S. Johanson, and Commissioners Irving A. Williamson and Meredith M. Broadbent.").  In a section entitled "Remedy Recommendations," the Commission's report states that "[i]n order to address the serious injury to the domestic industry producing CSPV products and be most effective in facilitating the efforts of the domestic industry to make a positive adjustment to import competition, the Commission recommended a series of actions."  *Id.* at 2.

The report described the recommendation of Chairman Schmidtlein as consisting of a tariff-rate quota on CSPV cells, with a 10% in-quota rate the first year, 9.5% in year two, 9% in year three, and 8.5% in year four.  *Id.*  She recommended an in-quota volume level of 0.5 gigawatts in the first year, 0.6 in year two, 0.7 in year three, and 0.8 in year four.  *Id.*  For cells, the out-of-quota rate would be 30% for the first year, 29% in year two, 28% in year three, and 27% in year four.  *Id.*  For CSPV modules, she recommended a tariff of 35% for the first year, 34% for year two, 33% for year three, and 32% for year four.  *Id.*

Vice Chairman Johanson and Commissioner Williamson joined in a recommendation that also consisted of a tariff-rate quota on cells and a tariff on modules.  *Id.*  Their recommended tariff-rate quota on cells would not increase tariffs for in-quota entries but would impose an out-of-quota tariff of 30% for the first year and decrease by five percentage points each subsequent year.  *Id.*  The in-quota volume would be 1 gigawatt, increasing to 1.2 in year two, 1.4 in year three, and 1.6 in year four.  *Id.*  For CSPV modules, they recommended a tariff of 30% for the first year, 25% for year two, 20% for year three, and 15% for year four.  *Id.*

Commissioner Broadbent did not recommend a tariff-rate quota or a tariff, recommending instead a quantitative restriction of imports of CSPV products, including cells and modules, set at 8.9 gigawatts for the first year and increasing by 1.4 gigawatts per year in each of the subsequent three years.  *Id.* at 3.  She recommended that the quantitative restriction be administered by the sale of import licenses at public auction, with the proceeds, as permitted by law, going to provide development assistance to domestic CSPV producers, and she also recommended trade adjustment assistance to the U.S. companies and workers.  *Id.*

In Count 1, plaintiffs seek judicial invalidation of the Proclamation based on a claim of a procedural flaw in the ITC report on which the President based his action.  Plaintiffs rely on

various provisions in the Trade Act, including in particular section 202(e)(1), 19 U.S.C.

§ 2252(e)(1) ("If the Commission makes an affirmative determination under subsection (b)(1) of

this section, the Commission shall also recommend the action that would address the serious

injury, or threat thereof, to the domestic industry and be most effective in facilitating the efforts

of the domestic industry to make a positive adjustment to import competition.").

Two decisions of the Court of Appeals have considered similar challenges in cases

involving presidential proclamations issued under the "escape clause" provisions,

sections 201-203, of the Trade Act. *Maple Leaf Fish Co. v. United States*, 762 F.2d 86

(Fed. Cir. 1985) involved a claim that an escape clause presidential proclamation on imported

"mushrooms, prepared or preserved" was based on an ITC injury finding that did not apply to

frozen mushrooms, the product plaintiff imported. The Court of Appeals affirmed the judgment

of this Court, which was based on a conclusion that the ITC's injury determination did in fact

apply to frozen mushrooms. *Corus Group PLC v. International Trade Commission*,

352 F.3d 1351 (Fed. Cir. 2003) involved a similar claim, which was that the President's escape

clause proclamation on imported steel products was invalid as to tin mill steel products because

the ITC's injury determination as to those products was not supported by three votes and

therefore was a negative determination, not an affirmative injury determination as required for a

valid safeguard measure under the Trade Act. The Court of Appeals affirmed, in relevant part,

the judgment of this Court, which was based on a conclusion that three commissioners had in

fact voted in favor of an affirmative injury finding as to the tin mill products. *Id.* at 1361-64.

The Court of Appeals also concluded that, contrary to the plaintiffs' claim, the Commission's

determination was adequately explained. *Id.* at 1364.

While having similarities to *Maple Leaf Fish* and *Corus Group*, this case differs from those cases in a significant respect: the claimed procedural flaw here does not pertain to the ITC's affirmative injury finding but instead to the ITC's failure to reach a remedy recommendation that was on behalf of the Commission as a whole.  The ITC's report to the President contained three different, and alternative, recommended actions.  The issue the Count 1 claim presents is whether the ITC's failure to reach agreement on, and report to the President, a recommended remedy that was on behalf of the Commission confined the discretion of the President to order the safeguard measure.  If it did, then the action of the Commission and, thereby, plaintiffs' Count 1 claim, are judicially reviewable.  *See Corus Group*, 352 F.3d at 1359. If it did not, then plaintiffs' Count 1 claim is not judicially reviewable because it is thereby reduced to a challenge to a decision Congress committed to the President's discretion.  *Id.* at 1358 ("The Supreme Court has established that where the President has complete discretion whether to take an action in the first place, courts are without authority to review the validity of an agency recommendation to the President regarding such action" (quoting *Dalton v. Specter*, 511 U.S. 462, 469-70 (1994).).  It is well established that a court, when presented a claim that the President exceeded delegated authority, may not review a decision by the President that Congress has committed to the President's discretion.  *See United States v. George S. Bush & Co.*, 310 U.S. 371 (1940); *Michael Simon Design, Inc. v. United States*, 609 F.3d 1335, 1338 (Fed. Cir. 2010) (citing *Dalton*, 511 U.S. at 469-70); *Motion Systems Corp. v. Bush*, 437 F.3d 1356 (Fed. Cir. 2006).

In section 330(d)(2) of the Tariff Act of 1930, 19 U.S.C. § 1330(d)(2), Congress addressed the situation in which the Commission reaches an affirmative injury determination under 19 U.S.C. § 2252(b) "and a majority of the commissioners voting are unable to agree on a

finding or recommendation described in section 2252(e)(1) of this title . . . (hereafter in this

subsection referred to as a 'remedy finding')." 19 U.S.C. § 1330(d)(2).  Congress provided that

in such a situation, a remedy finding supported by fewer than a majority of commissioners shall

be treated as the "remedy finding of the Commission" for purposes of 19 U.S.C. § 2253 if there

is one remedy finding supported by a plurality of three commissioners, *id.* § 1330(d)(2)(A) or, if

there are two remedy findings, each supported by a group of at least three commissioners, *id.*

§ 1330(d)(2)(B), the "remedy finding of the Commission" will be one of those two remedy

findings, as determined according to provisions thereunder, *id.* § 1330(d)(2)(B)(i) and (ii).  In

this way, the statute distinguishes between a "remedy finding" supported by one or more

commissioners and a "remedy finding of the Commission" for purposes of 19 U.S.C. § 2253.

The remedy finding of Vice Chairman Johanson and Commissioner Williamson was one

vote short of qualifying as a "remedy finding of the Commission," and the other two remedy

findings each fell short by two votes.  The court, therefore, presumes plaintiffs are correct in

asserting, Compl. ¶ 53, that "[t]he ITC did not recommend an action within the meaning of

section 202(e) of the Trade Act [19 U.S.C. § 2252(e)] before the President issued the

Proclamation," as required by that provision, *id.* ¶ 54.  The question, then, is whether plaintiffs

are likely to succeed on the merits of their Count 1 claim, which is that "[b]y adopting a

safeguard measure in the absence of a recommendation by the Commission, the President . . .

violated the express requirements of sections 201 and 203 of the Trade Act," and that "[a]ny

actions taken by CBP to implement or enforce the Proclamation against Plaintiffs are *ultra vires*

and unlawful," *id*.  Plaintiffs argue that "[t]he Act's text, its structure, its purpose, and decades of

historical practice all make clear that a Commission recommendation is an essential precondition

for the President to impose safeguard measures under section 201 of the Trade Act."  Mem. in

Supp. of Pls.' Mot. for TRO and Prelim. Inj. 23 (Feb. 7, 2018), ECF Nos. 10-1 (public), 17-1

(conf.) ("Pls.' Br.").  Below, the court considers whether plaintiffs are likely to succeed on their

arguments grounded in the Act's "text" and "structure," its "purpose," and "historical practice."

On "text" and "structure," sections 201(a) and 203(a) of the Trade Act, which contain

similar language, are informative on the question presented by the claim in Count 1.

Section 201(a) provides:

> If the United States International Trade Commission . . . determines under
> section 2252(b) of this title that an article *is being imported into the United States
> in such increased quantities as to be a substantial cause of serious injury*, or the
> threat thereof, to the domestic industry producing an article like or directly
> competitive with the imported article, the President, in accordance with this part,
> *shall* take all appropriate and feasible action within his power which the President
> *determines* will facilitate efforts by the domestic industry to make a positive
> adjustment to import competition and provide greater economic and social
> benefits than costs.

19 U.S.C. § 2251(a) (emphasis added).  Similarly, section 203(a)(1)(A) provides as follows:

> After receiving a report under section 2252(f) of this title [i.e., the report of the
> Commission] *containing an affirmative finding regarding serious injury*, or the
> threat thereof, to a domestic industry, the President *shall* take all appropriate and
> feasible action within his power which the President *determines* will facilitate
> efforts by the domestic industry to make a positive adjustment to import
> competition and provide greater economic and social benefits than costs.

19 U.S.C. § 2253(a)(1)(A) (emphasis added).  A condition precedent to the President's taking

"all appropriate and feasible action within his power" is an affirmative injury or threat

determination of the ITC under section 202 of the Trade Act.  Thus, in both sections 201(a)

and 203(a)(1)(A), the exercise of the President's discretion is expressly conditioned on an

affirmative injury or threat finding by the ITC.  But in neither section 201(a) nor

section 203(a)(1)(A) did Congress expressly condition the President's authority to act on the

President's being provided a "remedy finding of the Commission" within the meaning

of 19 U.S.C. § 1330(d)(2).  While both sections expressly condition presidential action on an

affirmative injury or threat finding, any conclusion that the President could not act in the absence

of a "remedy finding of the Commission," 19 U.S.C. § 1330(d)(2), can be reached only by

implication.  This contrast, by itself, casts some doubt on the plaintiffs' statutory interpretation.

Plaintiffs interpret sections 201(a) and 203(a)(1)(A) of the Trade Act in a way that permits their

interpretation, despite the specific reference to an affirmative finding of injury or threat.  They

submit that the statute, in various places, limits the President's discretion in the way they posit.

Among the provisions to which they direct the court's attention are paragraph (e)(1) of

section 202 of the Trade Act, 19 U.S.C. § 2252(e)(1) (which directs the ITC to recommend "the

action that would address the serious injury, or threat thereof, to the domestic industry"),

paragraph (e)(6) of that section (mentioning "the recommendation required to be made" by the

ITC), and section 203(a)(2)(A), 19 U.S.C. § 2253(a)(2)(A) (directing the President, "[i]n

determining what action to take," to "take into account," *inter alia*, "the recommendation and

report of the Commission.").

    Plaintiffs argue that the words "report under section 2252(f) of this title" as they appear

in section 203(a)(1)(A), 19 U.S.C. § 2253(a)(1)(A), must be read to mean a report that complies

in every respect with 19 U.S.C. § 2252(f), which in turn must be read to mean an ITC report that

contains a remedy finding qualifying as a remedy finding of the Commission, and not merely

multiple remedy findings by one or more commissioners that do not so qualify.  Reply in Supp.

of Pls.' Mot. for TRO and Prelim. Inj. 8 (Feb. 27, 2018), ECF No. 46 ("Pls.' Reply Br.").

Plaintiffs' interpretation places too much weight on the word "under," the ordinary meaning of

which connotes "pursuant to," or similar such words, but does not connote "in full compliance

with."  *See e.g.*, *Michael Simon Design,* 609 F.3d at 1341 (finding that "[a] recommendation

does not cease to be made 'under' section 3005 simply because the recommendation is assertedly

contrary to the substantive requirements of that provision," as "Congress frequently provides for

review of a decision made 'under' a statute; in such cases, it would be nonsensical to say that the

jurisdiction of the reviewing body is limited to instances in which the underlying decision

construes and applies the statute correctly."). The word "under" also appears in § 2252(f)(2)(B),

which provides that "[t]he Commission shall include in the report . . . the following: . . . If the

determination under subsection (b) of this section [the injury or threat finding] is affirmative, the

recommendations for action made *under* subsection (e) of this section and an explanation of the

basis for each recommendation."[2]  19 U.S.C. § 2252(f)(2) (emphasis added).  Even though the

Commission's recommendations did not constitute, as specified in subsection (e)(1), a

recommendation by the Commission of "*the* action that would address the serious injury, or

threat thereof, to the domestic industry," it does not necessarily follow that the three alternative

recommendations were not made "under subsection (e)."  In contrast to plaintiffs' strained

interpretation of 19 U.S.C. § 2253(a)(1)(A), the ordinary meaning of the words "[a]fter receiving

a report under section 2252(f) of this title containing an affirmative finding regarding serious

injury" connotes a report that contains, necessarily, an affirmative injury or threat finding, but

not necessarily one that also contains a recommendation qualifying as a "remedy finding of the

Commission" for purposes of § 1330(d)(2) and qualifying as a recommendation of "*the* action

that would address the serious injury, or threat thereof, to the domestic industry" as required by

§ 2252(e)(1).

---

[2] The use of the plural term "recommendations" in 19 U.S.C. § 2252(f)(2)(B) is not inconsistent with plaintiffs' construction.  When providing a single remedy recommendation under 19 U.S.C. § 2252(e)(1), the Commission may make an additional recommendation.  *See id.* § 2252(e)(4).

Plaintiffs rely on *Corus Group* in concluding that "the President cannot act under section 201 if he receives a report that lacks the elements—including a recommendation—that section 202(f) states that 'the Commission report must contain.'" Pls.' Reply Br. 8 (quoting *Corus Group*, 352 F.3d at 1362). They argue that "*Corus* held that a court may 'set aside' the President's action under section 201 if the Commission's report lacks an 'explanation for the conclusions reached,' as 'require{d}' by section 202(f)(2)(A); indeed, the court scrutinized whether that explanation was 'internally *consistent*' before upholding the President's action." *Id.* (citing *Corus Group*, 352 F.3d at 1361-64). Plaintiffs surmise that "[i]f the absence of an 'internally consistent' explanation required by section 202(f)(2)(A) was grounds for 'set{ting} aside' the President's action in *Corus*, then *a fortiori* the absence of *any* 'recommendation' required by section 202(f)(2)(B) is grounds for invalidating the President's action here." *Id.* This argument is unconvincing. The Court of Appeals in *Corus Group* was addressing a claim that a defect affecting the Commission's affirmative injury determination, specifically, the lack of an adequate explanation, invalidated the President's proclamation. Plaintiffs' Count 1 claim is not analogous to the one considered (and rejected) in *Corus Group*. The Trade Act unquestionably makes an affirmative injury or threat determination a condition for presidential action under the escape clause provisions, and the Court of Appeals considered an internally consistent explanation for that determination (on the part of each commissioner voting in the affirmative) to be a requirement of the statute and principles of administrative law. *Corus Group*, 352 F.3d at 1362-63. Because it did not involve the issue of whether an ITC report containing a remedy recommendation qualifying as a "remedy finding of the Commission," 19 U.S.C. § 1330(d)(2), is accorded status in the Trade Act equivalent to that of an affirmative

injury or threat determination, *Corus Group* does not address the central question posed by

plaintiffs' Count 1 claim.

With respect to section 201(a) of the Trade Act, 19 U.S.C. § 2251(a), plaintiffs argue that

in providing that "the President, *in accordance with this part*, shall take all appropriate and

feasible action," this provision must be read to mean that a presidential action issued without a

remedy finding of the Commission is not action taken "in accordance with this part."[3]  Pointing

to the President's obligation under section 203(a)(2)(A) of the Trade Act, 19 U.S.C.

§ 2253(a)(2)(A), to consider "the recommendation and report of the Commission," they submit

that the President's issuing the Proclamation absent a remedy finding of the Commission was not

an action "in accordance with this part."  This argument, while a possible reading of

section 201(a), presumes the very principle plaintiffs seek to establish, i.e., that under the escape

clause provisions of the Trade Act a remedy finding of the Commission is essential to the

exercise of the President's discretion in imposing a safeguard remedy.

Plaintiffs' argument that "the Act's purpose" compels an interpretation under which a

remedy finding of the Commission is needed for presidential action is likely to fare no better

than their argument on plain meaning.  Stated in fundamental terms, the Act's purpose is to

authorize the President to take "all appropriate and feasible action," 19 U.S.C. § 2253(a)(1)(A),

in response to the ITC's determining that "an article is being imported into the United States in

such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the

domestic industry producing an article like or directly competitive with the imported article," *id.*

§ 2252(b)(1)(A).  The President is to take the action that "the President determines will facilitate

---

[3] The reference to "this part" is to "Part 1-Positive Adjustment by Industries Injured by Imports" of "Subchapter II-Relief from Injury Caused by Import Competition."  Part 1 consists of sections 201-205 of the Trade Act of 1974, 19 U.S.C. §§ 2251-2255.

efforts by the domestic industry to make a positive adjustment to import competition and provide

greater economic and social benefits than costs." *Id.* § 2253(a)(1)(A).  Under plaintiffs'

interpretation, the Commission's inability to reach agreement on a remedy finding supported by

at least three commissioners would preclude the President from acting at all, despite the ITC's

finding of "serious injury, or the threat thereof," *id.*, to the domestic industry, which is the very

problem the statute was enacted to address.  The practical effect of plaintiffs' interpretation is

that the lack of an ITC remedy recommendation would negate the ITC's affirmative injury or

threat determination.  In other words, the President, even though presented with a situation in

which a domestic industry is incurring serious injury, would be powerless to respond.  For the

sole reason that the ITC could not agree on *a* remedy, that industry would receive *no* remedy.  In

this way, plaintiffs' interpretation would interfere with, rather than further, the statutory purpose.

Of course, the President, once presented with an ITC finding that a domestic industry is

incurring serious injury or threat, retains the discretion either to take the action that is

"appropriate and feasible," *id.* § 2253(a)(1)(A), or to take no action.  But in the latter case, the

President must decide, and report to Congress on his reasons for deciding, that "there is no

appropriate and feasible action to take under subsection (a)(1) of this section [*id.* § 2253(a)(1)]

with respect to a domestic industry."  *Id.* § 2253(b)(2).  The President has discretion, therefore,

to decide that there is no appropriate and feasible action that will facilitate the domestic

industry's efforts to adjust positively to import competition and provide greater economic and

social benefits than costs.  The Commission's failure to obtain three votes for a single remedy

recommendation is not the equivalent of a presidential determination that no such remedy exists.

The investigation of CSPV products is a case in point: the four Commissioners voted

unanimously that serious injury was occurring to the domestic industry making these products,

and they offered three different recommendations to address that injury. Notably, in enacting

19 U.S.C. § 2253(a)(1)(A) and (b)(2), Congress did not specify the lack of a single

recommended remedy on the part of the Commission as a reason why the President may exercise

the discretion not to take action.

Plaintiffs argue that a remedy finding on behalf of the Commission is essential to the

operation of other provisions of the Trade Act. Specifically, they argue that subparagraph (2)(A)

of § 2253(a), by directing that "[i]n determining what action to take under paragraph (1), the

President shall take into account . . . the *recommendation* and report of the Commission,"

imposes on the President a duty that is "impossible for" the President "to fulfill in the absence of

such a recommendation." Pls.' Br. 24. According to plaintiffs, the lack of a remedy finding on

behalf of the Commission also makes impossible the President's compliance with a provision in

19 U.S.C. § 2253(b)(1), which directs the President, on the day of taking action under

§ 2253(a)(1), to transmit a report to Congress describing the action being taken and the reasons

therefor. Specifically, they submit that the ITC's failure to provide a remedy finding on behalf

of the Commission made it impossible for the President to comply with the following directive

of § 2253(b)(1): "If the action taken by the President differs from the action required to be

recommended by the Commission under section 2252(e)(1) of this title, the President shall state

in detail the reasons for the difference." *Id.*

Plaintiffs also note that the absence of a remedy finding on behalf of the Commission

renders inoperative the congressional override procedure of 19 U.S.C. § 2253(c). Under that

procedure, Congress, within 90 days of submission of the report to Congress, may enact a joint

resolution (as specified in 19 U.S.C. § 2192(a)(1)(A)) setting aside any remedy the President

imposes that differs from the ITC's recommendation under § 2252(e)(1), or the decision not to

impose a remedy, and imposing the ITC's recommendation instead.  Pls.' Br. 25-27.

Plaintiffs correctly point out that the Commission's failure to provide, in the words of

19 U.S.C. § 1330(d)(2), a "remedy finding of the Commission" frustrated or defeated certain of

the functions of the statute.  The President is not in a position to consider a remedy

recommendation provided on behalf of the Commission when the Commission did not provide

one (although, in this case, the President was free to consider the three alternative remedies

offered by commissioners and adopted one similar to that supported by the plurality).  Nor could

the President explain to Congress, "in detail," *id.* § 2253(b)(1), his reasons for imposing a

remedy differing from the one the Commission offered, when none was offered.  Nevertheless,

from the standpoint of an analysis conducted according to *Corus Group*, 352 F.3d at 1359, of the

availability of judicial review over the ITC's and the President's actions, the court must conclude

that the Commission's failure to provide a "remedy finding of the Commission" did not confine

the President's discretion in any way.

As to the congressional override provision in particular, the absence from the ITC's

report of a remedy finding of the Commission, rather than confining the President's discretion,

confined the discretion of Congress to invoke its override authority.  Plaintiffs argue that without

resort to the override provision of 19 U.S.C. § 2253(c), Congress would be impaired in

exercising its constitutionally-vested authority to regulate foreign commerce.  Pls.' Br. 28-31;

Pls.' Reply Br. 11 (citing U.S. Const. art. 1, § 8, cl. 3).  The disabling of the override mechanism

is not insignificant.  But to attach to it the significance plaintiffs advocate, the court must

conclude that Congress intended to preclude the President from acting to remedy the injury or

threat when the ITC report lacked a qualifying remedy recommendation of the Commission,

despite the anomalous result the court has identified, in which serious injury is found to exist but the President, paradoxically, is powerless to act.  As the court discussed previously, the textual indications in the statute are to the contrary.  Moreover, the legislative history confirms that Congress did not intend to foreclose presidential action in the absence of a qualifying ITC recommendation.

As enacted in 1974, the escape clause provisions of the Trade Act also contained a congressional override provision.  Congress enacted the current section 330(d)(2) of the Tariff Act of 1930, 19 U.S.C. § 1330(d)(2), in the Tax Reform Act of 1976, Pub. L. No. 94-455, § 1801(a), (b), 90 Stat. 1520, 1762-63 (1976).  The Conference Report for that legislation explained that under then-current § 1330(d),

> if a majority of the Commissioners on the International Trade Commission voting on an escape clause or market disruption case under section 201 or 406 of the Trade Act of 1974, respectively, cannot agree on an injury determination or a remedy finding or recommendation, then the President may consider the "findings" agreed upon by one-half the number of Commissioners voting to be the "findings" of the Commission.  If the Commission is equally divided into two groups, the President may consider the finding of either group to be the finding of the Commission.

H.R. Rep. No. 94-1515, at 530-31 (1976) (Conf. Rep.), *reprinted in* 1976 U.S.C.C.A.N. 4118, 4228-29 ("*Conference Report*").  Prior to the 1976 amendment, Congress could override an escape clause determination of the President only when the President declined to adopt a remedy finding supported by a majority of voting commissioners.  If the Commission was equally divided into two groups, each supported by one-half the number of commissioners voting, and the President chose the remedy finding of one of those two groups, chose a different remedy, or chose to deny relief, there could be no congressional override.

The Senate Report for the Tax Reform Act explained the reason for amending section 330(d).  Because it is instructive as to the reason for the amendment, the court quotes it at

length.  After summarizing the congressional override provision in the Trade Act of 1974, the

Senate Report stated that:

> Under the Trade Act of 1974, if the Congress prefers the remedy recommended
> by the Commission rather than the relief proposed by the President, or if the
> President declines to grant relief, a majority of those present and voting of both
> Houses may pass a resolution within 90 Congressional working days requiring the
> President to implement the remedy recommended by the Commission.
>
> This was the manner in which the Trade Act was intended to work.
> However, in two of the six escape clause cases under the Trade Act in which the
> Commission found by a majority vote that injury existed, the Commission was
> unable to reach majority agreement with respect to a remedy.  In such cases, even
> though a majority of the Commission agree that an industry is being injured,
> because the Commission cannot agree as to what kind of relief is appropriate, the
> Congressional override mechanism of the Trade Act fails to function.  When the
> Commissioners are unable to reach, through compromise, a common position
> with respect to remedy, the Congress is deprived of its opportunity to override the
> decision of the President and to reinstate the recommendation of the Commission.
> In such a situation, the President is free to deny import relief—for reasons which
> may be rooted in foreign policy without adequate regard to sound economics—
> without fear of being overridden by the Congress.  The result is that an industry
> which may be found by the Commission to be entitled to import relief has been
> deprived of that relief, without good reason.

S. Rep. No. 94-938, pt. 2, at 57-58 (1976), *reprinted in* 1976 U.S.C.C.A.N. 4030, 4083 ("*Senate*

*Report*").  Having explained in this way the problem being addressed, the Senate Report then

discussed the solution to the problem as set forth in the Senate bill, as follows:

> The Committee's amendment would increase the probability that if there
> is a majority vote for injury, there would be a majority finding on a remedy.  The
> Committee's amendment would:
>
> (1) Change the number of Commissioners from six to seven (see section
>     2403);
> (2) Permit only those Commissioners who vote for injury to vote for a
>     remedy;
> (3) Require that a recommendation by a plurality of the number of
>     Commissioners voting for remedy be considered the Commission's
>     recommendation for import relief;
> (4) Require that a recommendation by any group of Commissioners voting
>     for remedy be considered the Commission's recommendation for

> import relief if the Commissioners are divided into two or more equal
> groups; and
> (5) Provide that a Commissioner whose term has expired may continue in
> office until his successor has been nominated by the President and
> confirmed by the Senate (see section 2403).

*Id.*  The conferees considered the Senate bill in the absence of a provision in the House bill.  The

final bill as agreed to in conference adopted only the change in paragraph (5) (although the

change in paragraph (2) would be adopted in an amendment to section 202 of the Trade Act

in 1988).  The final Tax Reform Act of 1976 included a modified version of the measures in

paragraphs (3) and (4), as the Conference Report explained:

> *Conference agreement.*—Under the conference agreement, if a majority of
> the Commissioners voting on an escape clause or market disruption case cannot
> agree on a remedy finding, then the remedy finding agreed upon by a plurality of
> not less than 3 Commissioners shall be treated as the remedy finding of the
> Commission for the purposes of the Congressional override in sections 202
> and 203 of the Trade Act of 1974.  If the Commission is tied on the remedy vote,
> and each voting group includes not less than 3 Commissioners, then (1) if the
> President takes the action recommended by one of those groups, the remedy
> finding agreed upon by the other group shall, for purposes of the Congressional
> override, be treated as the remedy finding of the Commission, or (2) if the
> President takes action which differs from the action agreed upon by both such
> groups, the remedy finding agreed upon by either such group may be considered
> by the Congress as the remedy finding of the Commission for purposes of the
> Congressional override.  It is the intention of the conferees that this apply only for
> purposes of implementing the Congressional override in sections 202 and 203 of
> the Trade Act of 1974.  It is not intended that this provision affect in any way the
> rules of procedure of the International Trade Commission.
>
> Further, the conferees strongly urge the Commissioners to reach majority
> agreement on all determinations, findings, and recommendations in all cases.

*Conference Report* at 530-31.

The Senate and Conference Reports show that Congress was aware that in some cases

under then-current law the Commission might agree that a domestic industry is undergoing

serious injury or threat but might not reach majority agreement on a remedy finding and that the

congressional override provision of section 203(c) of the Trade Act would not function in that

instance.  The solution agreed upon at conference allowed the congressional override mechanism to function in some instances in which the Commission did *not* reach majority agreement on a remedy finding.  For example, under the prior law the override was not available in the case of an evenly-divided Commission, with one half of voting commissioners supporting one remedy finding and the other half supporting another.  That was because the *President*, not Congress, could choose which of the two would be regarded as the remedy finding of the Commission. Under the 1976 amendment, in the event that three commissioners support a remedy finding not imposed by the President (whether the President grants relief or not), that remedy finding is available for adoption by the Congress.  Where two groups of three commissioners support different remedy findings, and the President chooses to adopt the remedy finding of one group, Congress may impose the remedy the President did not choose, and it may impose either one should the President choose to impose a different remedy or none at all.

Still, the solution adopted in the 1976 amendment did not ensure that a remedy finding of the Commission would be available in *every* escape clause proceeding: the override provision required that at least one remedy finding be supported by a group of three commissioners.  The Senate and Conference reports did not state or suggest that the President could not act to remedy the serious injury or threat in those cases in which the congressional override provision was not available.  Notably, the Congress, in amending section 330(d) of the Tariff Act, did not intend that its changes would confine the discretion of the President under the escape clause provisions of the Trade Act of 1974.  The Senate Report made this point explicitly:

> This section amends section 330(d) of the Tariff Act of 1930, relating to the voting procedures of the Commissioners in import relief cases.  The committee states that nothing contained in this section, or in any other provision of the amendment, is intended to alter the eligibility criteria for import relief under the Trade Act of 1974. . . .  In addition, the committee states that *nothing contained in this section, or in any other provision of the amendment, is intended*

> *to change the legal authority of the President under present law to select the type and level of import relief to be provided to an industry, be it the form of relief recommended by the Commission, a modification of the Commission's recommendation, or a denial of relief altogether.*

*Senate Report* at 57 (emphasis added).

In their brief and in their reply brief, plaintiffs point to other language in the Senate

Report, as follows:

> *International Trade Commission (Title XXIV)*
>
> The voting procedures of The International Trade Commission in import relief cases are changed to insure that the Congress will have an opportunity to override import relief decisions of the President under sections 201 and 406 of the Trade Act of 1974.  The Commission membership is to be increased from six to seven members, and certain other procedural and organizational changes are to be made with respect to the Commission.

*Senate Report* at 4-5; *see* Pls.' Br. 29; Pls.' Reply Br. 13.  This language appears in the

"Summary" at the beginning of the Senate Report, which summarizes all the changes in the

Senate bill.  The more specific, and far more detailed, discussion in the body of the Senate

Report, which clarifies that the changes in the Senate bill were intended to "increase the

probability that if there is a majority vote for injury, there would be a majority finding on a

remedy," *id.* at 58, is more instructive as to what the Senate bill was trying to achieve.  Also

instructive to the interpretation of the Senate Report is the nature of the changes the Senate bill

actually would have made.  None of the changes would do what plaintiffs argue Congress

intended: to prohibit presidential action, or to continue to prohibit presidential action, in the

absence of remedy finding of the Commission.

Plaintiffs also cite a statement by Senator Ribicoff, the sponsor of the 1976 amendment,

that the change was intended to "correct the serious problems that have developed in connection

with 'escape clause' actions under the Trade Act of 1974' and 'make sure that the escape clause

works in the future the way Congress originally intended it to.'"  Pls.' Br. 29 (quoting 122 Cong. Rec. 24,725 (1976) (statement of Sen. Ribicoff)) (emphasis omitted).  This language sheds no light on whether Congress ever intended to deny the President authority to impose a safeguard action in the absence of a remedy finding of the Commission.

According to plaintiffs, legislative history of the Customs Courts Act of 1980 confirms their interpretation of the escape clause statute.  They argue that "the drafters wrote that the Trade Act 'specif{ies} that the President may not act *until he has received advice from the International Trade Commission (ITC)* or the U.S. Trade Representative.'"  Pls.' Reply Br. 13 (quoting H.R. Rep. No. 96-1235, at 31 (1980), *reprinted in* 1980 U.S.C.C.A.N. 3729, 3743). The quoted language is from the report of the House Judiciary Committee on the legislation that established the Court of International Trade and is on the topic of the jurisdiction the new court should have.  An examination of the quoted sentence in the context in which it appears in the House report reveals that plaintiffs have misinterpreted the word "advice" in the quoted sentence. It was not a specific reference to a remedy finding of the Commission in an escape clause action. Nor was the intended meaning of the word "advice" one confined to "recommendations."  In the report, the House Judiciary Committee was referring generally to statutes authorizing the President to take actions to protect the United States and American manufacturers against injury due to the importation of foreign goods and not in particular to sections 201-203 of the Trade Act.[4]  The context of the discussion was an explanation of the reasons for deleting certain

---

[4] The paragraph reads as follows:

Pursuant to his statutory authority, the President may take certain actions to protect the United States and American manufacturers against injury due to the importation of foreign goods.  These *statutes* specify that the President may not act until he has received advice from the International Trade Commission (ITC)

(continued . . .)

jurisdictional provisions in the original version of the House bill, H.R. 6394.  H.R. Rep.

No. 96-1235 at 31-32.  One of the jurisdictional provisions being deleted, section 1581(d), would

have granted the new court jurisdiction to review, following publication of a final presidential

decision, "the *advice, findings, recommendations, and determinations* of the International Trade

Commission under section[s] 131, 201, 202, 203, 304, 406, and 503 of the Trade Act of 1974,

section[s] 336 and 338 of the Tariff Act of 1930, and section 22 of the Agricultural Adjustment

Act, solely for the purpose of determining the procedural regularity of such actions."  *Id.*

at 31 n.9 (emphasis added).

Plaintiffs argue, further, that the 1988 amendments to the escape clause provisions in the

Trade Act, made as part of the Omnibus Trade and Competitiveness Act of 1988, confirm that

Congress intended to foreclose presidential discretion to impose a safeguard measure in the

absence of a qualifying ITC recommendation.  Pls.' Br. 29; Pls.' Reply Br. 13.  As alluded to

previously, Congress amended section 202, adding the limitation in current paragraph (e)(6),

which provides that only the commissioners who agreed to the affirmative injury or threat

determination "are eligible to vote on the recommendation required to be made under

paragraph (1) [the recommendation of 'the action that would address the serious injury or threat

thereof'] or that may be made under paragraph (3) [directing the ITC to specify the 'type,

amount, and duration of the action' it recommends]."  19 U.S.C. § 2252(e)(6).  In paragraph (6),

Congress referred to the remedy finding of the Commission as a requirement, but under the

---

(. . . continued)

or the U.S. Trade Representative (USTR).  Current law does not provide for the
judicial review of the substantive advice rendered by the ITC or the U.S. Trade
Representative.

H.R. Rep. No. 96-1235, at 31 (1980) (emphasis added), *reprinted in* 1980 U.S.C.C.A.N. 3729,
3743.

pre-1988 statute it already was treated as a requirement.[5]  Nothing in the 1988 amendment or its

legislative history[6] indicates that Congress intended to make a qualifying remedy finding of the

ITC a prerequisite to presidential action to address the serious injury or threat.

Plaintiffs' argument that their statutory interpretation is supported by "decades of

historical practice" is also unconvincing.  Pls.' Br. 23.  Plaintiffs argue that the Proclamation is

"unprecedented" in acting in the absence of a remedy finding of the Commission, positing that

past practice has guided the Supreme Court in determining questions of presidential authority.

Pls.' Br. 30 (citing *Medellin v. Texas*, 552 U.S. 491, 531 (2008)).[7]  In support of their argument,

plaintiffs indicate their disagreement with the ITC's contention that this action is not

---

[5] The escape clause provisions in the 1974 version of the Trade Act (which renamed the "U.S. Tariff Commission" the "U.S. International Trade Commission") directed that the Commission, if reaching an affirmative injury finding, "*shall . . . find the amount of the increase in, or imposition of, any duty or import restriction on such article which is necessary to prevent or remedy such injury.*"  19 U.S.C. § 2251(d)(1)(A) (1976) (emphasis added).  The President had discretion to impose a different remedy, or no remedy.  *Id.* § 2252(a), (b).

[6] The report of the Senate Finance Committee explains that the new limitation on voting procedures, which restored a prior ITC practice that had not recently been followed, would, first, prevent commissioners who disagreed with the affirmative injury or threat finding from skewing the recommendation to make it less effective.  "Second, the provision improves the likelihood that the ITC will make a unified recommendation to the President regarding actions to be taken."  S. Rep. No. 100-71, at 56 (1987).  The Finance Committee stated that it "believes that it is important to have a consensus from the ITC on the actions recommended."  *Id.*  Nothing in the Senate report indicates that Congress ever intended to deprive the President of authority to impose a remedy to address the serious injury or threat in the *absence* of such consensus.

[7] *Medellin* is inapposite.  In that case, the Supreme Court considered an "unprecedented" exercise of purported presidential power undertaken *absent congressional authorization*, finding that Congress had never "acquiesced" to the President's authority to unilaterally direct state courts to implement non-self-executing treaty obligations.  *Medellin v. Texas*, 552 U.S. 491, 531-32 (2008).  In this case, the President acted pursuant to an express mandate from Congress, which directed that "the President shall take all appropriate and feasible action within his power which the President determines will facilitate efforts by the domestic industry to make a positive adjustment to import competition and provide greater economic and social benefits than costs."  19 U.S.C. § 2253(a)(1)(A).

unprecedented.[8]  The court need not decide this question.  In this case, the question of past

practice has no bearing on whether plaintiffs have shown a likelihood of success on the merits of

their Count 1 claim, which presents an issue of statutory interpretation.  Moreover, the President

was under no obligation to explain in the Proclamation why his decision either did or did not

accord with past practice.

    In summary, plaintiffs' statutory interpretation encounters serious difficulties when

considered according to the plain meaning, purpose, and legislative history of the escape clause

provisions.  The likely outcome is a conclusion that the ITC's decision was not judicially

reviewable because the absence of a remedy finding of the Commission in the ITC's report did

not confine the President's discretion to issue the Proclamation.  Therefore, plaintiffs have failed

to show a likelihood of success for the claim they assert in Count 1 of their complaint.

    2. On their Count 2 Claim, Plaintiffs Are Unlikely to Demonstrate that the Tariff-Rate Quota on
            CSPV Cells Violated the NAFTA Implementation Act

    In Count 2, plaintiffs claim that the Proclamation cannot lawfully be applied to them

because it imposes a safeguard action including a tariff-rate quota that fails to comply with the

NAFTA Implementation Act.  Compl. ¶¶ 55-60.  Section 312(d) of the NAFTA Implementation

Act provides as follows:

> Any action taken under this section proclaiming a quantitative restriction shall
> permit the importation of a quantity or value of the article which is not less than
> the quantity or value of such article imported into the United States during the
> most recent period that is representative of imports of such article, with allowance
> for reasonable growth.

19 U.S.C. § 3372(d).

---

    [8] The Commission filed a brief in support of a motion to dismiss the Commission as a
defendant in this case.  *See* Mot. to Dismiss and Mem. in Supp. of Mot. to Dismiss of Def. U.S.
Int'l Trade Commission (Feb. 20, 2018), ECF No. 33.  Because plaintiffs have not had the
opportunity to respond to this motion, the court does not consider the ITC's motion at this time.

As a threshold consideration, plaintiffs are faced with an issue of standing on which they may not be able to prevail.  They do not allege that they produce or export CSPV cells, which is the "article" that is the subject of the tariff-rate quota in the Proclamation.  *See* Compl. ¶¶ 8, 9, 11.  Three of the four plaintiffs—Silfab Solar, Inc., Heliene, Inc., and Canadian Solar Solutions, Inc.—are Canadian producers of CSPV modules.  *Id*.  Regarding cells, the only fact they allege that relates to the production, exportation, or importation of cells is that plaintiff Canadian Solar (USA), Inc. is a U.S. importer of solar cells, but they do not allege that these are Canadian cells.  *Id*. ¶ 10.  The complaint further alleges, however, that "no Canadian company . . . produces CSPV cells that are not assembled into other products."  *Id*. ¶ 4.  Plaintiffs argue, unpersuasively, that the "*entire* safeguard constitutes a tariff-rate quota" as it "imposes a 30% tariff on solar products and then exempts a quota of certain solar products from that tariff."  *See* Pls.' Reply Br. 14-15 (emphasis in original) (citations omitted).

Even were plaintiffs able to establish standing to assert their Count 2 claim, they still would be unlikely to prevail because they have not demonstrated that their interpretation of 19 U.S.C. § 3372(d) to encompass the tariff-rate quota in the Proclamation is correct.  To be inconsistent with § 3372(d), a safeguard measure must be a "quantitative restriction" and it must fail to "permit the importation" of the specified quantity or value of the affected article.

The individual subsections of section 312 of the NAFTA Implementation Act, 19 U.S.C. § 3372, all pertain to presidential actions "under chapter 1 of title II of the Trade Act of 1974 [19 U.S.C. § 2251 et seq.]," i.e., under the escape clause provisions of sections 201-205 of the Trade Act.  19 U.S.C. § 3372(a), (b), (c), (d) (referring to "[a]ny action taken under this section."]).  In section 203(a)(3) of the Trade Act, Congress identified "tariff-rate quota[s]" and "quantitative restriction[s]" as separate remedies.  19 U.S.C. § 2253(a)(3)(B), (C).  Specifically,

Congress plainly authorized the President to proclaim a tariff-rate quota in § 2253(a)(3)(B) and

to proclaim *any* quantitative restriction in § 2253(a)(3)(C).  Even if, theoretically, some forms of

tariff-rate quotas may be described as "quantitative restrictions," plaintiffs are unlikely to make

the case that Congress, in 19 U.S.C. § 3372(d), intended to preclude actions such as the

tariff-rate quota in question, which places no "restriction" on the quantity or value of solar cells

that may be imported.  And contrary to plaintiffs' argument that the entire safeguard measure is a

quantitative restriction, the Proclamation places no restriction on the quantity or value of any

solar cell product that may be imported, be it cell or module.

Plaintiffs argue that section 312(d) must be read in concert with NAFTA article 802.5(b),

which provides that "[n]o Party may impose restrictions . . . that would have the effect of

reducing imports of such good from a Party below the trend of imports of the good from that

Party over a recent representative base period with allowance for reasonable growth."  *See* North

American Free Trade Agreement, Can.-Mex.-U.S., art. 802.5(b), Dec. 8-17, 1992, 32 I.L.M. 289

(1993), *available at* https://www.nafta-sec-alena.org/Home/Texts-of-the-Agreement/North-

American-Free-Trade-Agreement?mvid=2 (last visited Mar. 5, 2018) (the "NAFTA").  Plaintiffs

also argue that a tariff-rate quota is a "textbook example of a quantitative restriction," citing the

General Agreement on Tariffs and Trade 1947 ("GATT") and a U.S. submission to a World

Trade Organization panel in a dispute with the European Communities on banana importations.

Pls.' Br. 32. (citing Second Written Submission of the United States, *European Communities—*

*Regime for the Importation, Sale and Distribution of Bananas*, ¶¶ 82-85, WTO Doc. WT/DS27

(Sept. 27, 2007), *available at*

https://ustr.gov/sites/default/files/uploads/Countries%20Regions/africa/agreements/pdfs/dispute_

settlement/ds27/asset_upload_file841_13273.pdf (last visited Mar. 5, 2018)).  Plaintiffs argue

that "the Proclamation 'permit{s} the importation' of a dramatically reduced . . . 'quantity {and}

value of' Canadian CSPV products" because "[t]he Proclamation's duties will make it

prohibitively expensive for Plaintiffs to continue selling CSPV products in the United States."

*Id*. at 33.  According to plaintiffs, "[t]he word 'permit' means not only 'to consent to expressly or

formally' but also 'to make possible' as a practical matter," so "measures that do not formally

prohibit importation, but effectively make importation impossible, are widely understood as

prohibitions in international trade law."  Pls.' Reply Br. 16-17.  These arguments suffer from the

same flaws.  They interpret 19 U.S.C. § 3372(d) contrary to plain meaning and to the different

treatment of tariff-rate quotas and quantitative restrictions in 19 U.S.C. § 2253(a)(3).  Again,

19 U.S.C. § 3372(d) requires measures to "permit" importation of a specified quantity or value of

an article.  Neither the duties on modules nor the out-of-quota duties on cells fail to "permit"

importation.

### 3. Plaintiffs Are Unlikely to Demonstrate that the Proclamation Is *Ultra Vires* for Failing to Exempt CSPV Products from Canada from the Safeguard Measure

Plaintiffs' Count 3 claim is that defendants violated section 312(b) of the NAFTA

Implementation Act because the Proclamation failed to exclude Canadian imports of CSPV

products from the global safeguard.  *See* Compl. ¶¶ 61-67 (citing, *inter alia*, 19 U.S.C.

§§ 3371(a), 3372(a)-(b)).  Plaintiffs make three supporting arguments: (1) that the President was

required to exempt Canada from the global safeguard because the ITC found that imports from

Canada did not "account for a substantial share of total imports" and did not "contribute

importantly to the serious injury, or threat thereof, caused by imports," Pls.' Br. 34 (citing

19 U.S.C. §§ 3371(a), 3372(a)-(b); NAFTA art. 802.1); (2) that where the "contribute

importantly" determination of the ITC is negative, section 203(a) of the Trade Act, 19 U.S.C.

§ 2253(a), which requires an affirmative injury or threat finding by the ITC before the President

may act, "forbids the President from taking action against a NAFTA country to redress such

injury," Pls.' Br. 35 (citing 19 U.S.C. § 2253(a)); and (3) that because "Canadian imports plainly

do not constitute a 'substantial share' within the meaning of" 19 U.S.C. § 3372(a)(1), the

President could not have concluded otherwise without violating § 3372(a), Pls.' Br. 35 (citing

19 U.S.C. § 3372(a)(1)).  Because these arguments are flawed, plaintiffs are unlikely to succeed

on the merits of their Count 3 claim.

<u>a. The NAFTA Implementation Act Permits, But Does Not Require, the President to Exempt
Imports from a NAFTA Country from a Global Safeguard</u>

Plaintiffs argue that "a NAFTA country must be excluded from a global safeguard action

unless imports from that country 'account for a substantial share of total imports' and 'contribute

importantly to the serious injury, or threat thereof, caused by imports.'"  Pls.' Br. 34 (citing

19 U.S.C. §§ 3371(a), 3372(a)-(b); NAFTA art. 802.1).  Plaintiffs misinterpret the NAFTA

Implementation Act.  When certain conditions are present, the President *may* exclude imports of

a NAFTA country from a global safeguard action under the Trade Act.  But the statute does not

provide that the President *must* do so.  Instead, the statute provides that the President "shall

exclude" the imports from a NAFTA country if the President determines either that (1) imports

from the NAFTA country do not account for a substantial share of total imports, or (2) imports

from a NAFTA country, considered individually, or in exceptional circumstances imports from

NAFTA countries considered collectively, do not contribute importantly to the serious injury, or

threat thereof, found by the Commission.  19 U.S.C. § 3372(a)-(b).  The President did not reach

either of those negative determinations and stated in the Proclamation that he reached affirmative

determinations on each.  *Proclamation* ¶ 7.  The ITC found under section 311(a) of the NAFTA

Implementation Act, 19 U.S.C. § 3371(a), that imports of CSPV products from Canada do not

account for a substantial share of total imports and do not contribute importantly to the serious

injury caused by the imports.  *Views of the Commission* at 67.[9]  But under section 312(b) of the

NAFTA Implementation Act, those findings did not bind the President.  *See* 19 U.S.C. § 3372(b).

The plain language of the NAFTA Implementation Act, therefore, is contrary to plaintiffs'

statutory interpretation.  The Statement of Administrative Action accompanying the NAFTA

Implementation Act confirms this conclusion:

> Sections 311 and 312 of the bill implement the global action provisions of [NAFTA] Article 802.  They authorize the President, in the case of a global action under sections 201-204 of the Trade Act of 1974, to exclude imports of a Canadian or Mexican good when certain conditions are met.
>
> * * *
>
> Under section 312, the President must exclude NAFTA imports from a global safeguard action if he makes a negative determination that imports from a NAFTA country account for a substantial share of total imports or imports from a NAFTA country or countries contribute importantly to the serious injury or threat of serious injury.

H.R. Doc. No. 103-59 at 564-65 (1993).

Plaintiffs argue that the Proclamation violates the NAFTA.  Pls.' Br. 35-36.  International

agreements may aid in the interpretation of the ambiguous statutes implementing them, but there

is no ambiguity in section 312(b).  *See* 19 U.S.C. § 3372(b) ("the President shall exclude from

such action imports from a NAFTA country if *the President* makes a negative determination

under subsection (a)(1) or (2) of this section with respect to imports from such country"

(emphasis added)).

Plaintiffs also argue that the use of the word "find" in section 311(a) demonstrates that

Congress "wished to authorize the Commission to make a conclusive judgment" because when

Congress "wished the Commission's judgment to be merely advisory, it used the word

---

[9] Chairman Schmidtlein dissented.  "She finds that under section 311(a) . . . U.S. imports of CSPV products from Canada account for a substantial share of total imports and contribute importantly to the serious injury caused by imports."  *Views of the Commission* at 67 n.387.

'recommend.'"  Pls.' Br. 36.  This argument fails to explain why Congress would require the

President to make the same "substantial share of total imports" and "contribute importantly to the

serious injury" determinations, *see* 19 U.S.C. § 3372(a), that it required the Commission to

make, *see* 19 U.S.C. § 3371(a).  Were the Commission's findings binding on the President,

Congress would not have done so, yet section 312(b) requires the President to exclude from a

global safeguard remedy "imports from a NAFTA country if *the President* makes a negative

determination under subsection (a)(1) or (2) of this section."  19 U.S.C. § 3372(b).

Finally, plaintiffs argue that past presidential safeguard proclamations have established a

practice of excluding imports from NAFTA countries from the global safeguard when the

Commission makes negative "substantial share of total imports" and "contribute importantly to

the serious injury" findings.  Pls.' Br. 37-38.  If such a practice exists, it is not relevant to the

statutory interpretation issue presented by plaintiffs' Count 3 claim.

<u>b. The Requirement for an Affirmative Injury Determination in the Trade Act Did Not Require
the President to Exempt Canadian CSPV Products from the Scope of the Proclamation</u>

Plaintiffs argue that the report of the ITC, which found that imports of CSPV products

from Canada do not "contribute importantly" to the serious injury the ITC found to exist, did not

contain "an affirmative finding regarding serious injury" within the meaning of

section 203(a)(1)(A) of the Trade Act, 19 U.S.C. § 2253(a)(1)(A), and accordingly "forbids the

President from taking action against a NAFTA country to redress such injury."  Pls.' Br. 35.

This argument misinterprets the relationship between the two statutes.  It presumes, incorrectly,

that a negative finding by the ITC under section 311(a)(2) of the NAFTA Implementation Act,

19 U.S.C. § 3371(a)(2) (the "contribute importantly" finding), is equivalent to a negative injury

determination under section 202(b)(1) of the Trade Act, 19 U.S.C. § 2252(b)(1).  It is not.

In an investigation under section 202 of the Trade Act, the Commission is required to "determine whether an article is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry."  19 U.S.C. § 2252(b)(1)(A).  *If* the Commission makes an affirmative injury or threat determination, *then* section 311(a) of the NAFTA Implementation Act requires the Commission to also find whether "(1) imports of the article from a NAFTA country . . . account for a substantial share of total imports; and (2) imports of the article from a NAFTA country . . . contribute importantly to the serious injury, or threat thereof, caused by imports." 19 U.S.C. § 3371(a).  These "substantial share" and "contribute importantly" findings are distinct from, and subsequent to, the Commission's injury or threat determination.  That is, the Commission's section 311(a) findings are made only *if,* and *after*, the Commission makes an affirmative determination of injury or threat under section 202(b)(1) of the Trade Act.  *See* 19 U.S.C. § 3371(a).  If the Commission makes a negative injury or threat determination under section 202(b)(1) of the Trade Act, then the occasion of making the "substantial share" and "contribute importantly" findings under the NAFTA Implementation Act never arises.  *See id.* A negative ITC determination under 19 U.S.C. § 2252(b)(1) binds the President, but a negative ITC finding under 19 U.S.C. § 3371(a)(2) does not.  It does not negate the affirmative injury determination as it applies to the NAFTA country such that the President must exclude the NAFTA country from a global safeguard action.

c. The President's Determinations under Section 312(a) are Not Subject to Judicial Review

Plaintiffs' third argument in support of its Count 3 claim is that the President could not conclude on this record that Canadian imports constitute a substantial share of total imports without violating § 3372(a).  Pls.' Br. 35, 38-42.  This argument is also unlikely to succeed.

Determinations of the President that Congress has committed to the President's discretion are not subject to judicial review. *Dalton*, 511 U.S. at 477; *George S. Bush & Co.*, 310 U.S. at 380.

Plaintiffs argue that "where Congress has imposed discernible statutory *limits* on the President's authority, the courts have time and again made clear it is the courts' obligation to determine whether the President has 'clear{ly} misconstrue{ed}' the statutory language or 'act{ed} outside delegated authority.'" Pls.' Br. 38 (quoting *Corus Group*, 352 F.3d at 1361 (quoting *Maple Leaf Fish*, 762 F.2d at 89)). They argue, further, that the President misconstrued the meaning of the term "substantial share" as used in the NAFTA Implementation Act, Pls.' Reply Br. 18, asserting that "a country that supplies only 2% of imports and is the ninth-largest supplier of an article does not account for a '*substantial* share' of imports as those words are used in the NAFTA Implementation Act," *id.* at 17-18 (citations omitted). The NAFTA Implementation Act, in the section applying to the *Commission's* determinations (19 U.S.C. § 3371), provides that "[i]n determining whether imports from a NAFTA country, considered individually, account for a substantial share of total imports, such imports normally shall not be considered to account for a substantial share of total imports if that country is not among the top 5 suppliers of the article subject to the investigation, measured in terms of import share during the most recent 3-year period." 19 U.S.C. § 3371(b)(1). By using the word "normally," Congress indicated that this criterion was not a specific limitation that was binding even on the ITC. At its essence, plaintiffs' argument is directed at the fact-related determination that the President made under § 3372(a)(1). Plaintiffs do not present a colorable claim that the President misconstrued the NAFTA Implementation Act or acted outside delegated authority.

The determination the President made under § 3372(a)(1) was one of two determinations, pursuant to § 3372(a)(1) and (a)(2) respectively, that call for the President to exercise judgment

on matters Congress confined to the President's discretion.  The exercise of the President's

judgment in making those determinations is not subject to review by the court.  *See George S.*

*Bush & Co.*, 310 U.S. at 377-80 (holding that a statute requiring the President to find that the

rates of duty and changes are "necessary to equalize such differences in costs of production"

before taking action afforded the President discretion such that the exercise of the President's

judgment was beyond judicial review); *Motion Systems*, 437 F.3d at 1361-62 (holding

unreviewable a presidential decision to deny import relief under section 421 of the Trade Act

of 1974 despite also concluding that the Trade Act placed some restriction on the President's

discretion to grant or deny import relief).  Here, as courts have held in similar situations, "the

President's findings of fact and the motivations for his action are not subject to review."  *Corus*

*Group*, 352 F.3d at 1361 (quoting *Maple Leaf Fish*, 762 F.2d at 89).

<u>E. The Public Interest Does Not Weigh In Favor of an Injunction</u>

To obtain a temporary restraining order or preliminary injunction, plaintiffs must

demonstrate that the equitable relief requested would be in the public interest.  *Wind Tower*

*Trade Coal.*, 741 F.3d at 95; *see also* 11A Charles Alan Wright, Arthur R. Miller & Mary Kay

Kane, Federal Practice and Procedure § 2948.4 (3d ed. 2013) (noting that "preliminary relief will

be denied if the court finds that the public interest would be injured were an injunction to be

issued").  Plaintiffs have not met that burden.

Plaintiffs argue that the public interest is "served by ensuring that the {Executive}

complies with the law."  Pls.' Br. 42 (quoting *SKF USA Inc. v. United States*, 28 CIT 170, 176,

316 F. Supp. 2d 1322, 1329 (2004)).  *SKF* is inapposite.  That case involved a statutory

injunction against liquidation of entries subject to an antidumping duty order, issued under

19 U.S.C. § 1516a(c)(2).  Duties on such entries are secured by cash deposits of estimated

antidumping duties.  *See SKF*, 28 CIT at 173, 316 F. Supp. 2d at 1326.  The issue in that case

was whether the injunction remained in effect through appeals.  *See SKF*, 28 CIT at 174-87,

316 F. Supp. 2d at 1327-38.  Here, plaintiffs ask the court to enjoin defendants immediately from

"taking any action to impose or enforce" the Proclamation and to enjoin CBP from the

"collection of any tariff from the Plaintiffs" pursuant to the Proclamation.  *See* Proposed Order.

Plaintiffs ask the court to enter such an injunction with "only a nominal bond" or reliance "on

plaintiffs' existing continuous bonds."  Pls.' Reply Br. 22-23.  This could expose the government

to the risk of being unable to collect safeguard duties owed once the entries are liquidated should

it ultimately prevail in this litigation.

Plaintiffs also argue that the public has an interest in "enforcing 'compli{ance} with this

country's treaty obligation.'"  Pls.' Br. 42 (quoting *Robles Antonio v. Barrios Bello*,

No. 04-12794-GG, 2004 WL 1895123 at *3 (11th Cir. Jun. 10, 2004) (per curiam)).  Similarly,

plaintiffs contend that the issuance of the injunction they seek would "protect the public's

interest in Congress's oversight role under the Trade Act."  *Id*.  But as discussed earlier in this

Opinion and Order, plaintiffs cannot demonstrate a likelihood of success on the merits of the

claims underlying these assertions.

Plaintiffs argue, further, that the public interest would be served by an injunction because

the Proclamation "harms workers, industries, and consumers in the United States" as "Canadian

CSPV products support jobs in the U.S. solar sector."  *Id*. at 43 (directing the court's attention to

letters written by various governmental officials).  This argument invites the court to consider

matters of public policy that are beyond the scope of the judicial review of this action.  These are

matters the President was tasked with considering when determining whether a contemplated

action "provide[s] greater economic and social benefits than costs," 19 U.S.C. § 2253(a)(1)(A), a

determination Congress confined to the President's discretion.

### III. CONCLUSION AND ORDER

Plaintiffs have failed to show that they are likely to succeed on the merits for any of their

claims and that the equitable relief they seek would be in the public interest.  Having failed to

meet two essential requirements for the issuance of a temporary restraining order or preliminary

injunction, the court must deny their motion.  Therefore, upon consideration of their motion,

upon all papers and proceedings had herein, and upon due deliberation, it is hereby

**ORDERED** that plaintiffs' motion for a temporary restraining order and a preliminary
injunction be, and hereby is, denied; and it is further

**ORDERED** that the caption shall be amended to the form in which it appears on this
Opinion and Order.

                                           /s/Timothy C. Stanceu
                                        Timothy C. Stanceu, Chief Judge

Dated:  March 5, 2018
         New York, New York